IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOHNATHAN LEWIS HELM,               §
                                    §
            Petitioner,             §
                                    §
v.                                  §          Civil Action No. 4:18-CV-088-O
                                    §
LORIE DAVIS, Director,              §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
                                    §
            Respondent.             §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Johnathan Lewis Helm, a state prisoner confined in the Correctional Institutions

Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of

TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has

concluded that the petition should be denied.

## I. BACKGROUND

On January 15, 2014, a jury in Tarrant County, Texas, Case No. 1276053D, found Petitioner

not guilty on one count of continuous sexual assault of a child under 14 years' of age but guilty on

one count of sexual assault of a child under 17 years of age and one count of prohibited sexual

conduct and assessed his punishment at 20 years' and 10 years' confinement, respectively. Clerk's

R. 95-96, 107-08, 111-15, 121, ECF No. 16-4. The trial court ordered the sentences to run

consecutively. Reporter's R., vol. 5, 33, ECF No. 16-16. Petitioner's convictions were affirmed on

appeal, and, on September16, 2015, the Texas Court of Criminal Appeals refused his petition for

discretionary review. Electronic R. 2, ECF No. 16-2. Petitioner sought and obtained an extension of

time to file a motion for rehearing until October 19, 2015, however no such motion was ever filed. Petitioner did not seek writ of certiorari. Pet. 3, ECF No. 1. On January 9, 2017,[1] Petitioner filed his initial postconviction state habeas-corpus application challenging his convictions, which was denied by the Texas Court of Criminal Appeals on July 12, 2017, without written order on the findings of the trial court. SHR01[2] 20 & Action Taken, ECF Nos. 16-18 & 16-20. On June 7, 2017, Petitioner filed an amendment to his initial application, which was denied by the Texas Court of Criminal Appeals on July 26, 2017, without written order on the findings of the trial court. SHR02 & Action Taken, ECF Nos. 16-21 & 16-23. Petitioner filed this federal habeas petition challenging his state convictions on July 19, 2017.[3] Pet. 7(a)-7(d), 10, ECF No. 1.

The state appellate court summarized the facts of the case as follows:

> K.A., the complainant, was [Petitioner]'s stepdaughter. K.A. turned sixteen in November 2010 shortly before Thanksgiving. K.A. said she and [Petitioner] had sex together during Thanksgiving in November 2010 in Oklahoma. However, on other occasions, K.A. said the sex occurred in their home in Fort Worth, Texas. K.A. had a baby in August 2011. DNA showed [Petitioner] was the father. [Petitioner] admitted having sex with K.A. on Thanksgiving in Oklahoma in 2010.

> [Petitioner] conceded doing some research on the charges against him and said he thought the age of consent in Oklahoma was sixteen.

Mem. Op. 2, ECF No. 16-3.

---

[1] A prisoner's state habeas application is deemed filed when placed in the prison mailing system. *Richards v. Thaler*, 710 F.3d 573, 578-79 (5th Cir. 2013). Petitioner's state applications do not provide the date he placed the documents in the prison mailing system, however the "Inmate's Declaration" in each application is signed and dated. For purposes of this opinion, the applications are deemed filed on those dates.

[2] "SHR01" refers to the record of Petitioner's state habeas proceeding in WR-87,042-01; "SHR02" refers to the record of his state habeas proceeding in WR-87,042-02.

[3] Likewise, a federal habeas petition filed by an inmate is deemed filed when the petition is placed in the prison mail system for mailing. *Spotville v. Cain*, 149 F.3d 374, 377 (5th Cir. 1998). Petitioner asserts in his petition that he placed the document in the prison mailing system on July 19, 2017; thus, the Court deems the petition filed on that date.

## II.  STATUTE OF LIMITATIONS

Respondent asserts that the petition should be dismissed because it is time-barred under the federal statute of limitations. Resp't's Answer 5-8, ECF No. 14. Title 28, United States Code, § 2244(d) imposes a one-year statute of limitations on federal petitions for writ of habeas corpus filed by state prisoners. Section 2244(d) provides:

> (1)  A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of–
>
> > (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

With limited exceptions not applicable here, the limitations period begins to run from the date on which the challenged "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" under subsection (A). *Id.* § 2244(d)(1)(A). Petitioner correctly notes that he timely moved for and was granted an extension of time until October 19,

2015, to file a motion for rehearing upon refusal of his petition for discretionary review. Pet'r's Objs. 2-3, ECF No. 17. Therefore, for purposes of the statutory provision, Petitioner's judgment of conviction became final, at the latest, on January 17, 2016, 90 days from October 19, 2015. *Wilson v. Cain*, 564 F.3d 702, 706-07 (5th Cir. 2009); SUP. CT. R. 13.1. Once triggered, the limitations period expired one year later on January 17, 2017. Therefore, Petitioner's federal petition was due on or before January 17, 2017, absent any tolling.

Tolling of the limitations period may be appropriate under the statutory provision in § 2244(d)(2) and/or as a matter of equity. Petitioner's state habeas applications, pending from January 9, 2017, through July 26, 2017, operated to toll the limitations period under § 2244(d)(2) for 199 days, making his petition due on or before January 4, 2018. Therefore, the petition filed on July 19, 2017, was timely filed.

## III. ISSUES

In seven grounds for relief, Petitioner asserts that he received ineffective assistance of trial counsel and that the evidence was insufficient to prove that he sexually assaulted K.A. in the state of Texas. Pet. 6(a)-7(d), ECF No. 1.

## IV. RULE 5 STATEMENT

It does not appear that the petition is subject to dismissal for failure to exhaust state-court remedies or subject to the successive-petition bar.

## V. DISCUSSION

### A. Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act,

a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter,* 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). And, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018).

## B. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An ineffective-assistance claim is governed by the familiar

standard set forth in *Strickland v. Washington*. 466 U.S. at 668. To establish ineffective assistance of counsel under this standard, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Id.* at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record or was based on an unreasonable determination of the facts. *Richter,* 562 U.S. at 100-01 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Under grounds one through six, Petitioner asserts that his trial counsel was ineffective by—

(1)     failing to request limiting instructions upon admission of nonhearsay evidence through the testimony of CPS investigator Charlene Elliott);

(2)     opening the door to otherwise inadmissible hearsay evidence (State's Exhibit No. 2, Elliott's audio recording of her interview with K.A.);

(3)     failing to make an additional hearsay objection to admission of evidence that

was inadmissible under Texas Rules of Evidence 801 and 802 (K.A.'s statements within Elliott's audio recording regarding the location of the offense);

(4)     failing to request limiting instructions upon admission of K.A.'s prior inconsistent statements;

(5)     failing to request limiting instructions upon admission of otherwise inadmissible hearsay (State's Exhibit 5A, a letter written by K.A.);

(6)     failing to request limiting instructions upon admission of otherwise inadmissible hearsay (K.S.'s prior inconsistent statements through the testimony of the adoption caseworker Lisa Bergeron).

Pet. 6(a)-(b), 7(a)-(c), ECF No. 1.

Counsel, Terence Sean Bajuk, responded to the allegations in a lengthy affidavit presented in the state habeas-corpus proceedings as follows (any errors in spelling, grammar, and/or punctuation are in the original):

I.     Representation of [Petitioner] prior to January 13, 2014.

I was initially retained by [Petitioner] on September 23, 2011. At the time he met with me, [Petitioner] had been contacted by Ms. Charlene Elliott with Child Protective Services and was aware of the allegation that he was the father of his step-daughter's child. Since the investigation was only beginning and no indictment or arrest had been made of [Petitioner] at that time, my initial representation was limited to communicating with other witnesses and/or police to see if this matter would need to proceed any further. Based on the information provided to me by my client at the time, I thought it wise not to pursue any direct communication with the police or to agree to any interviews (other than compliance with the subpoena for a DNA sample). I did, however, meet with [K.A.], the alleged victim, and her mother, [J.H.], in the Fall of 2011 at my office. I conducted an in-person interview of [K.A.] outside the presence of her mother and verified [Petitioner]'s story that any sexual contact between her and [Petitioner] had only taken place in Oklahoma. My impressions of [K.A.], however, were less than positive. [K.A.] demonstrated a clear antagonism and disrespect towards her own mother and adults in general, and I recall her attempting to deceive me about even simple facts regarding her own background. This behavior concerned me enough that I conveyed it to [Petitioner], expressing that I held a distrust and high uncertainty regarding her reliability going forward. As the Court is well aware and the trial record later reflects, [K.A.] would admit that she had

7

a habit of lying to people, particularly when she was upset or angry with them.

Tarrant County records reflect that the Fort Worth Police Department did not initially file charges in this case until March 27, 2012. At that time, the charges were limited to Sexual Assault of a Child under 17 years of age. As recollection serves, I spoke with Mr. Kevin Boneburg, Assistant Criminal District Attorney for Tarrant County in the Spring of 2012, before indictment, in an effort to see if the charges could be dropped based on my interviews with both [Petitioner] and [K.A.]. With the knowledge and permission of my client, I advised Mr. Boneburg that both [Petitioner] and [K.A.] had stated to me that there was only one sexual encounter between them and that it had occurred out of State. I encouraged Mr. Boneburg to investigate this further, including speaking with [K.A.] and following up on the information, as I had understood it, that would have been conveyed to Detective Bell.

I periodically followed up with Mr. Boneburg and/or his fellow assistants through the Summer and into the Fall of 2012 while making appearances in Court with [Petitioner]. During that time period, I continued to consult with and counsel [Petitioner], particularly with regards to his actions and communications with any family members. [Petitioner] had indicated he was having to seek employment outside of Texas due to the fact that he had resigned his position with the Tarrant County Sheriffs Office and could not find suitable employment with the pending charges. I repeatedly instructed him to not communicate with [K.A.] consistent with the bond restrictions; further, when [J.H.] moved with the children, including [K.A.], to Georgia, I advised my client not to travel to Georgia to see his family out of concern for those same bond conditions. As the trial record would later reflect, [Petitioner] clearly did not adhere to my advice and went to the family's new home in Georgia, resulting in two critical incidents that directly impacted his case. I note them now only so that the Court may have an appropriate context to my actions during the trial.

First, testimony in the trial indicated that [Petitioner] was present in Georgia at or near the time that [K.A.] was arrested and charged with a criminal offense in Newton County, Georgia. [K.A.] admitted in trial that she believed her step-father had had her "thrown in jail"; as a result, [K.A.] became angry with [Petitioner] and agreed to follow her Georgia attorney's advice when she prepared a separate statement for the Texas investigator that outlined new allegations regarding [Petitioner]'s conduct. These allegations served as the basis for the State to later initially indict [Petitioner] for the offense(s) of Continuous Sexual Abuse of a Young Child and Aggravated Sexual Assault; the State would also become aware of [Petitioner]'s presence in the State at that time as evidenced by its notation in Paragraph 8 of the State's "Notice of Intent to Introduce Evidence of Extraneous Offenses, Other Crimes, Wrongs and Acts" that was filed on January 10, 2014.

Second, [Petitioner] was arrested in Georgia on January 7, 2014, less than a week prior to his last trial setting, for the offense of Obstruction of a Witness, to wit: [Petitioner] was accused of having attempted to prevent the service of a material witness warrant on [K.A.], the complainant in the accusations against him. Although [Petitioner] later attempted to explain his presence and assert ignorance regarding [K.A.'s] whereabouts that same day, it directly jeopardized efforts I had already made – and been partially successful in obtaining – to resolve his case.

During the Summer and Fall of 2013, I had spoken with Mr. Thielman, the Chief Prosecutor, in an effort to negotiate a plea bargain offer that encompassed probation for my client. As memory serves, Mr. Thielman was amenable to such a plea bargain and had notified me of his willingness to waive the first three counts of the indictment and proceed with a plea on Count Four, Prohibited Sexual Conduct. I had conveyed to my client that disposition of this case by plea bargain was possible; however, it was rejected by my client because it also required him to register as a sex offender. Still, my efforts to work with Mr. Thielman had also resulted in one other benefit: On November 1, 2013, Mr. Thielman filed the "State's Notice Of Intent to Waive Indictment Counts", indicating that it would agree to proceed to trial only on Count Four, the Prohibited Sexual Conduct charge, a 3rd degree felony. This notice was filed prior to a trial setting in November 2013, and it was still available, to my knowledge, up until the point [Petitioner] was arrested in Georgia.

Even more significantly, it was Mr. Thielman, not my client, who first notified me of his arrest in Georgia. In that conversation, Mr. Thielman indicated the events in Georgia would now force him to retract his earlier waiver and proceed forward with the original indictment; equally, any probation offers were now null and void. He also included [Petitioner]'s charge in Georgia in the 404(b) Notice referenced earlier.

It also bears mentioning that [K.A.'s] arrest, of course, resulted in her being returned to the State of Texas in the custody of the Tarrant County Sheriffs Department. This meant her appearance in jail clothing before the Court, and especially before the jury selected at [Petitioner]'s trial, clearly would have an impact on the impression she might leave observers with as she testified about the facts in this case.

After [Petitioner] was indicted and it was clear that he wanted to proceed to trial, I filed several standard pre-trial motions with the Court in June 2013. Equally, based on the new allegations raised by [K.A.'s] statement to the investigator – allegations, I would note, that had never been made to me during my interview with her in the Fall of 2011 – my client asked me to interview his own biological daughter, [A.H.], regarding her experiences with her step-sister. [Petitioner] represented [A.H.] and [K.A.] had been fairly close when they were younger and believed she might be

a relevant witness for his defense in light of the new allegations. Subsequently, I did interview [A.H.] at my office. [A.H.] was very cooperative and helpful in addressing questions I had about her step-sister's veracity. Based on the interview, I later secured a subpoena for her to testify based on my belief at that time that her testimony would be relevant due to her knowledge of [K.A.'s] character. Equally, I also contacted [J.H.], [Petitioner]'s wife, to see if she would also agree to testify on [Petitioner]'s behalf as a character witness both for him as well as to address [K.A.'s] credibility. Unfortunately, she declined. I advised my client of this and noted that while we could subpoena his wife as well, compelling her to testify against her will ran the risk of her becoming a hostile witness. As I recall, [Petitioner] also indicated that he did not want to force his wife to travel to Texas to testify at that time.

I also secured a subpoena of [Petitioner]'s personnel records as they related to his work hours at the Tarrant County Sheriffs office; the purpose of this subpoena was to obtain records that could directly refute [K.A.'s] claims in her statement that [Petitioner] had enough contact with her to rape her "up to almost 4 times a day".

As with any trial, I also prepared written questions in advance for the witnesses I believed were particularly crucial to the case. In this instance, I had written questions (and strategized as to possible answers and relevant objections) for my cross-examination of Charlene Elliot, Detective Bell and [K.A.].

II.    Representation During Trial

A. Request for Plea

As the reporter's record reflects, during the course of the trial, [Petitioner] advised me of his interest in pursuing a plea bargain on three separate occasions: prior to the start of the voir dire on January 13, 2014; after the State's voir dire on January 13th and on January 15th at the beginning of the day. At my client's direction, I spoke with Mr. Thielman and Mr. Boneburg and conveyed their offers to [Petitioner].

[Petitioner] summarily rejected the offer of ten (10) years that was made prior to voir dire on January 13th and the offer of fifteen (15) years that was conveyed on January 15th. However, at the end of the State's voir dire on January 13th, 2014, I notified [Petitioner] that the State was willing to offer him eight (8) years in exchange for a plea to the charge of Sexual Assault or ten (10) years to the charge of Prohibited Sexual Conduct. At that time, I urged [Petitioner] to accept one of those offers, indicating that I believed it was in his best interest to do so. The record indicates he initially agreed to take the plea, however, after the Court notes that the State should "write it up", the record only notes that we continued with the trial and began voir dire for the Defense. I do not recall why there was no further record made.

10

B. [Petitioner]'s Claims of Ineffective Assistance of Counsel

1. My thought process in approaching [Petitioner]'S Case

In his Application, [Petitioner] succinctly states "The crux of [his] defense in this case is that the sexual act occurred outside the territorial jurisdiction of the State of Texas." [Petitioner] is correct that this was the principal theory of the case for the defense with regards to the offense of Prohibited Sexual Conduct and Sexual Assault of a Child; in fact, it was his only logical theory. By each of those counts, the State only needed to prove one sexual act had occurred. Unfortunately for [Petitioner], who by his own account admitted to me from the start of the case that he had sexual contact with [K.A.], he could not escape the fact that he had also conceived a child with [K.A.] as a result of his conduct. Given that there was no way – as I perceived it – to challenge the DNA results, [Petitioner] had no other choice but to pursue that theory. This did not mean, however, that I perceived his case would entirely depend on preventing the State from hearing [K.A.'s] conflicting testimony. It also became inevitable, in my view, once the State proceeded to trial on the Continuous Sexual Abuse allegation.

As I warned my client, though, while it was entirely plausible that a pregnancy could have resulted from one single act of sexual intercourse in Oklahoma, the theory also required a fact finder to believe that [Petitioner] and [K.A.] were telling the truth. Since [K.A.] had made inconsistent statements regarding her step-father's conduct (and, as I noted earlier, my own interview with her revealed a concern with her tendency towards deception), I was greatly concerned about her testimony on the stand. Would she be willing to testify for the State or even return to Texas? How would she react on the stand? Which version of the events would she give, the one she told me, or the first version she gave to Ms. Elliott? All trial lawyers understand that the demeanor of the witness is just as critical as what they say on the stand. While I also considered what objections to make in order to deal with these statements, I did not know for certain the order in which testimony would be proffered by the State.

In trial work, I always plan for the possibility that my objections to documents or testimony may be overruled, requiring me to deal with all of the evidence the State may have obtained in its investigation. In preparing for this trial, in the event that Ms. Elliott or Detective Bell presented their interviews with [K.A.] before she testified, I had already made notes to object to the testimony under *Crawford v. Washington* as well as to assert a general hearsay objection. I strongly believed that there was no question the statements [K.A.] made to Ms. Charlene Elliot, a CPS investigator, would be viewed as "testimonial" as understood under that case. Previous case law also existed to support my thinking. I further felt *Crawford* would be relevant since [K.A.'s] presence, including her willingness to testify, was not assured.

Equally, an objection to hearsay appeared appropriate as well. I did not perceive the statements [K.A.] gave to Ms. Elliott or Detective Bell were admissible under any exceptions to the hearsay rule, nor did I see that the State would be able to argue that the statements of [K.A.], particularly those related to the number of alleged times [Petitioner] touched her or where the contact took place, could be offered as statements "not for the truth of the matter asserted". To put either statements in front of the jury and deny their probative value or relevance to the case particularly one that now included a Continuous Sexual Abuse allegation, would not make sense.

If and when [K.A.] testified, however, I did not see any way to avoid having the jury hear what [K.A.] had alleged. Granted, hearing the testimony of a victim and having extrinsic evidence by way of a written statement containing the allegations are technically two different things; however, in my view, as [Petitioner]'s defense counsel, the oral testimony was likely to carry sufficient weight under the facts of this case. The State clearly needed to establish that [Petitioner] had had sexual contact with [K.A.] more than once, even if one of those times had included the trip to Oklahoma. As she was their witness, it was logical to presume they would try to introduce her statements in support of that offense. Therefore, I reasonably assumed that if she denied them, the State would be permitted to impeach her under Rule 607 regarding her credibility and under Rule 613 by asking [K.A.] about those statements pursuant to the predicate under the rule. If she acknowledged having made such statements – which she did in the trial – the jury would now have reason to question her credibility, even if the statements were not admitted as substantive evidence. Likewise, I would have had the same opportunity to utilize these rules as well if necessary.

I recognize, of course, that Rule 613 does state that extrinsic evidence of the statement "shall not be admitted" if the witness unequivocally admits having made the statement. To the extent a Court would determine that did this, I recognize and must fully admit that I did not object on this basis, thereby allowing the jury to have an actual copy of the statement published to them.

2. General responses to [Petitioner]'s claims

a.    Ground One: The failure to request a limiting instruction at the admission of non-hearsay evidence through Ms. Elliott's testimony.

As [Petitioner] notes in his own writ, I urged a hearsay objection when Ms. Elliott was asked to explain what [K.A.] had told her regarding the allegations of abuse by [Petitioner]. [Petitioner] asserts, however, that the use of Ms. Elliott's testimony in this context could have been limited "to its proper scope and not for the truth of the matter assented". While [Petitioner] further asserts that [K.A.'s]

12

statements to Ms. Elliott have been introduced for a limited purpose to show "why Ms. Elliott continued in her investigation", he does not explain how the details within her statements – specifically where the abuse occurred – would have been necessary to show why the investigation continued when it did. A review of the record itself shows that Ms. Elliot had been able to testify, without objection, that she was investigating an allegation that [Petitioner] was the father of his step-daughter's child. This allegation in itself would have justified an investigation.

Texas Rule 105 (a) specifically states:

> (a)    Limiting Instruction. When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request the court's action in admitting such evidence without limitation shall not be ground for complaint on appeal.

As I noted before, at the time I prepared for trial, I perceived Ms. Elliot's testimony, if introduced prior to [K.A.]'s appearance on the witness stand, to be clearly inadmissible both on the basis of *Crawford* as well as under Texas Rules of Evidence 801(d). It frankly did not occur to me at the time to have requested such an instruction, nor would I have viewed it as wise even if I had reflected on this particular Rule prior to trial. This was not a situation where I believed the State could reasonably argue it was using the testimony "not for the truth of the matter asserted" because the probative value of the statements alone were apparent on their face; for the alleged victim to claim that she was sexually abused in Texas would have provided the necessary support to prosecute [Petitioner] in the State of Texas. Furthermore, had I asked for a limiting instruction, I would have had serious doubts that the jury could have subsequently adhered to such an instruction in this case and ignored the implications. In my view, at the time of the Court's ruling to overrule my objections, in the context of the trial, I felt I had made my record, especially since it was not yet clear that [K.A.] would still testify at all.

> b.    Ground Two: Counsel opened the door to otherwise inadmissible hearsay evidence

Petitioner asserts that I "opened the door" to inadmissible hearsay due to my cross-examination of Ms. Elliot regarding the discrepancies in [K.A.'s] testimony and her behavior. In making his argument, [Petitioner] attempts to draw comparison between the facts of his case to those cited in *Ibenyenwa v. State* and *Mick v. State.*

In *Ibenyenwa,* counsel for the defendant had repeatedly questioned the

forensic interviewer regarding the techniques she had used in her questioning of a small child. The forensic interviewer had admitted it was wrong to ask leading questions of the child; when defense counsel asserted she did it 124 times after receiving an answer of "no" to several questions, the State moved to admit the interview pursuant to Rule 107, the rule of optional completeness. Defendant's counsel raised an objection under 403 that the admission would be more prejudicial than probative; however, the trial court determined the rule of optional completeness applied. On appeal, the appellate court agreed that the trial court had not erred in admitting the video.

In *Mick,* the defense attorney had elected to question a detective about a forensic interview he witnessed but had not personally conducted. Through his cross-examination of the detective, counsel attempted to question the detective's basis for probable cause from reviewing statements made by the defendant on the video. On re-direct, the State requested that the interview be admitted under Rule 107. Defense counsel raised a hearsay objection to the video's admission; he also asserted that the interviewer/witness was not a proper outcry witness. Again, the appellate court determined that the trial court had not erred in admitting the video.

Unlike the facts in *Ibenyenwa,* my questioning of Ms. Elliott did not involve an assertion that she had violated her own standards of investigation, nor did I actively assert that she had tried to force [K.A.] to answer a particular way. Equally, in this case, Ms. Elliott conducted her own interview on September 13, 2011; while I did ask her questions about the answers provided to Detective Bell on September 15, 2011, it is important to again recall that I had made my objections to those statements prior to cross-examination. There is no such indication that the defense counsel in *Mick* or *Ibenyenwa* had done the same.

[Petitioner] also cites *White v. Thaler,* incorrectly referencing it for the proposition that the defense counsel was "found to be ineffective for opening the door for the prosecutor to directly attack the defendant's alibi". Instead, *White* concerns the prejudice caused to the defendant's case when 1) the defense counsel improperly questioned the defendant about his post-arrest silence after taking the stand; and 2) defense counsel did not seek a motion in limine to restrict mention that the murder victim was pregnant. While this case also involved [Petitioner] waiving his rights against self-incrimination and taking the stand, [Petitioner] did so against his own attorney's advice and raises no argument as to the impact his own testimony may have had in his conviction. Still, I would submit *White* also does not help [Petitioner] with his contention in this writ.

I did not "open the door" to the testimony contained on the tape-recorded interview. Instead, I was properly cross-examining Ms. Elliott on the questions she asked [K.A.] in order to elicit testimony from Ms. Elliott that I thought would be

favorable to the defense of my client. It would seem from [Petitioner]'s argument, however, that I should have remained silent to have avoided the State from using evidence already in its possession. Towards that end, my questioning Ms. Elliott as to the types of responses [K.A.] gave her, the attitude expressed by [K.A.], the contradictions in her testimony – all were relevant questions to explore whether the State's witness could trust [K.A.'s] statements. Given that the State had been permitted to use Ms. Elliott's testimony to introduce [K.A.'s] statements, I could not ignore them, nor would that have been wise. In particular, it was through my cross-examination that I was able to emphasize two points: First, Ms. Elliott did not obtain specifics as to when the acts of abuse occurred, a statement that would be relevant in later attacking the State's evidence to support the Continuous Sexual Abuse charge; and Second, that [K.A.'s] responses to the question of the location of the abuse, at the time she addressed it in her interview, was potentially unreliable in that it appeared [K.A.] was not paying attention to what she was responding to at that time. It is hard to see how these actions were not consistent with my obligations as [Petitioner]'s defense counsel.

This line of questioning was later covered when I cross-examined [K.A.] directly regarding her level of focus during the interview with Ms. Elliot:

> Q. And Charlene came to your school and she's testified even in front of the court here today that you two had an interview about these allegations, correct?
> A. Yes.
> Q. And you, at that time, did mention that you had had sex with your stepfather. Do you recall that?
> A. Yes.
> Q. But your answers were not in the context of being upset, were you?
> A. No.
> Q. Okay. And, in fact, would you say -- were you really paying much attention to what you were saying in that interview?
> A. No, because I was at school for one and it was embarrassing for her to be up there.
> Q. It was embarrassing to you?
> A. Yeah.
> Q. Because a lot of kids talk and wonder why you're going out of class.

I viewed the context of the interview as highly relevant as it went to the veracity of [K.A.'s] statements on September 13, 2011. Considering, as I noted, that the credibility of [K.A.'s] claims regarding the location of the abuse, I could not have ignored this information once those statements came into evidence; therefore, my

election to cross-examine Ms. Elliott (and later, to address this again with [K.A.]) was not unreasonable or unprofessional. I would further assert that these efforts were directly related to my ability to later persuade the jury to not accept [K.A.'s] other statements regarding the Continuous Sexual Abuse allegation.

c.        Ground Three: Failure to make the proper hearsay objection to the admission of the evidence (i.e. the audio recording)

As I previously noted in response to Ground One and Ground Two, I had made several objections to the oral testimony Ms. Elliott provided from the witness stand regarding what she was told by [K.A.]. While I do not deny that at the moment the actual recording was tendered to me for admissibility, I did not make a specific objection as to hearsay, I would simply assert the impact of the actual recording being admitted as evidence after my prior objections were overruled was likely negligible, particularly since the jury would later hear [K.A.] directly confirm that she had previously accused [Petitioner] of sexually abusing her at their home in Fort Worth. Since the trial court had already overruled me regarding my hearsay objections to the initial interview Ms. Elliott conducted with [K.A.], I could not have made any other objections to the admission of the recording since Ms. Elliott was the sponsoring witness and had personally made the recording. As for the objections to the video interview with both Ms. Elliott and Detective Bell, I again submit that I was of the belief that *Crawford* applied in this case, barring admission of any statements of [K.A.] until she took the stand on her own accord.

d.        Ground Four: Failure to request a limiting instruction on admission of inadmissible hearsay and
e.        Ground Five: Failure to request a limiting instruction on admission of otherwise inadmissible hearsay

In Ground Four, [Petitioner] asserts that I failed to request a limiting instruction when the State questioned [K.A.] about her prior inconsistent statements, allowing the State to address, in front of the jury, [K.A.'s] previous allegations that the sexual abuse had occurred in Fort Worth, Texas.

With regard to the statements [K.A.] had made to Ms. Elliott in her interview(s) with Ms. Elliott as well as Detective Bell, it was my perception that Mr. Boneburg was entitled to ask her about those statements pursuant to Rule 613(a). Further, based on the trial court's previous rulings when Ms. Elliott took the stand, these same statements were already admitted before the jury for all purposes. As such, I must admit again that I did not even consider a request for a limiting instruction in that case, nor can I see how the trial court would have been obligated to grant one. Instead, my focus at that time was to ensure that the jury heard [K.A.] directly deny the allegation regarding the situs of the conduct and/or result for the

16

offense when she personally testified under oath. To that end, the record will clearly reflect [K.A.] did just that, an action that I would submit, at this point, was a significant reason I successfully argued for [Petitioner]'s acquittal on the Continuous Sexual Abuse charge.

With regard to the oral statements made by [K.A.] to Ms. Hinojosa in Georgia during October 2012, I again would note that I expected these questions would be permissible under Rule 613(a). As part of its predicate, Mr. Boneburg was required to elicit an answer from [K.A.] as to her memory of making the contradictory statement. These questions, by themselves, were not objectionable, nor did I perceive that it was my duty to make a request for a limiting instruction at the time the State initiated such an inquiry in its direct examination. Since [K.A.] did admit to having made the statements Mr. Boneburg inquired about, I believe the critical question, pursuant to Rule 613(a) was whether her responses were unequivocal such that the actual admission of the document was objectionable.

In reviewing the reporter's record again, I must concede that it does appear [K.A.'s] testimony was sufficient to argue that Rule 613(a) would have barred the direct admission of the extrinsic evidence, to wit: the original copy of her written statement to Ms. Hinojosa. While it is possible in the midst of trial my impression, hearing her testimony live, may have been otherwise, the responses Mr. Boneburg obtained from [K.A.] concede to the majority of the statements made in the document. As such, I should have made an objection to State's Exhibit 5A (the original statement itself) regardless of the fact that [K.A.] personally authenticated said document.

Having said that, Mr. Boneburg still had a right to ask the questions he asked before the jury. This mean that the jury would *hear,* even if they would never retain a copy for later reflection in deliberation, that [K.A.] had admitted to making the contradictory statements.

As defense counsel, I addressed this matter directly by introducing two separate exhibits through [K.A.], both written statements that corroborated her direct testimony on the stand that the sexual abuse had only occurred one time out of state. I also emphasized through her testimony the incredulousness of her accusations as well through my own cross-examination:

> Q. In fact, the statement here that Mr. Boneberg read to the jury, would you agree with me it seems a little bit exaggerated to begin with?
> A. Four times a day every day is a lot. He doesn't —
> Q. Is that realistic?
> A. No, because he was a sheriff. He wouldn't have the time.

Q. Okay. In fact, you even made allegations of him trying to either harm you or harm the baby, correct?

A. Correct.

Q. Did that ever happen?

A. No.

Q. Did he ever threaten you if you told anybody?

A. No.

Q. In fact, we are – Ms. Elliott was in here earlier. Did your father or mother ever threaten you about anything once this came out?

A. No.

Q. So you made up the allegations here?

A. Yes

While I again concede that a proper motion could have been made to exclude the actual document, I do not agree that such an objection would have limited the impact of the jury hearing such allegations. Mr. Boneburg would still have been able to ask her about the statements nonetheless. As I also stated previously, how the jury viewed [K.A.] in the end was critical to the case. [Petitioner]'s own arguments further ignore the fact that the territorial jurisdiction can be established by circumstantial evidence. To the extent that [K.A.] appeared to simply be switching her stories to benefit her step-father, I needed to demonstrate that the behavior described in that exhibit were so beyond the pale that no one could help but doubt that they were valid; in turn, I further emphasized [K.A.'s] motivation – that she was angry with [Petitioner] at the time because she believed he had her arrested – that the jury would ignore the statements outright. This especially became crucial because [K.A.] was testifying to the jury while still dress in jail clothing. Therefore, I had her address this under cross-examination:

Q. Were you angry at your stepfather at the time you wrote that?

A. Yes.

Q. Why were you angry at [Petitioner]?

A. Because I thought he had thrown me in jail.

Q. [Petitioner] wasn't working for the State of Georgia, correct?

A. Yes.

Q. So how would he have thrown you in jail?

A. Because I went -- because he didn't -- I saw the officers outside of the house laughing and that's -- I mean, I didn't know what to believe. I was in the interview room and he went out, but I had to stay. That's what my belief was.

Q. And you were arrested for -- is that -- what you're saying is that you were arrested for things you thought your father had had a hand

in getting you arrested, correct?
A. Yes.
Q. Do you know different now?
A. Yes.
Q. Okay. Do you blame your father now for what happened to you in
Georgia?
A. No

In contrasting her behavior the last time she had been arrested, a time when she clearly lied as motivation to strike back against [Petitioner], I demonstrated to the jury her willingness to tell the truth at trial because she harbored no further ill will towards him. I believed such testimony was crucial in my arguments and helped me to later secure an acquittal on the 1st degree charge of Continuous Sexual Abuse.

Again, while I concede that I failed to make an objection to the admission of the State's exhibit, the actual testimony of [K.A.] – conceding to the prior statements that sexual abuse had occurred in Texas – was not avoidable. I also believe my efforts at trial were consistent with trial strategy to diminish and refute any potential weight a factfinder would have reasonably given to them.

With regards to Count Five, I would simply, in the interest of brevity, refer back to the response I just made.

    f.    Ground Six: Failure to request a limiting instruction on admission of inadmissible hearsay

[Petitioner] contends that I failed to request a limiting instruction to the hearsay statements of Ms. Lisa Bergeron, a caseworker at the Gladney Center for Adoption. [Petitioner] correctly notes that the State questioned Ms. Bergeron regarding [K.A.'s] representation as to where the baby was conceived. I will also concede that in this instance, I did not raise an objection to the statement being hearsay, nor did I attempt to limit its admissibility by asking for a limiting instruction. Since [K.A.] had already testified that she was sexually active and was uncertain as to whether [Petitioner] was really the father of the child, I likely did not view these statements as having any greater weight for the jury.

Still, [Petitioner]'s point in this instance is well taken; I could have made an objection and did not. As I will explain later, I do not believe, however, that there is a reasonable probability that the outcome of [Petitioner]'s trial would have been different.

C.  Motion for Directed Verdict and Dismissal of Charges

I feel it is important to briefly note that the record clearly shows that at the end of the State's case, I made a Motion for Directed Verdict to the trial court. While this motion initially was made to address the first count of the indictment regarding Continuous Sexual Abuse, my remarks also noted that I believed Art. 36.11 of the Code of Criminal Procedure was applicable as well, asserting that the trial court had sufficient information from the record to question whether jurisdiction had been established. As the record also reflects, the trial court overruled my motion.

I feel it is relevant to note this action, however, since it goes to the totality of the representation provided to Mr. Helm, demonstrating, as I believe, that I acted in the same manner that a competent attorney in my position would have done.

D. [Petitioner]'s decision to testify

At the close of the defense's case, [Petitioner] notified me that it was his desire to testify on his own behalf. The record will note that I directly counseled him against doing so. Despite that fact, [Petitioner] persisted.

> Q. [Petitioner], one more time, you had approached me about testifying; is that correct?
> A. Yes.
> Q. I have again advised you strongly that I am against the idea personally that you testify, as my client. Do you understand that?
> A. Yes.
> Q. And you have instructed me that, in disregard of my advice, you do want to take the stand?
> A. I do.
> Q. You understand that you will be asked questions from both sides and you will not be allowed to just simply give a full narrative on your own to the jury? Do you understand that?
> A. Yes

After taking the stand, Mr. Thielman, questioned [Petitioner] under cross-examination about various topics, including his ability to be alone with [K.A.] when they were at their house in Fort Worth:

> Q. So your testimony here is that there was no times that you were the -- or significant times that you were the sole parent at home with [K.A.]?
> A. There have been occasions when I have been the sole parent at home, but not the majority of the time, no.
> Q. Were you alone with your stepdaughter [K.A.]?
> A. Have I been in the past?

Q. Yes.
A. Yes

About [Petitioner]'s training as an officer regarding sexual abuse and grooming;

Q. And you had not only basic, but also intermediate certification in child abuse investigations and in child abuse offenses through TCLEOSE; is that correct, sir?
A. That is correct.
Q. All right. That includes the laws that govern the prosecution and the enforcement of child abuse, correct, sir?
A. Yes.
Q. That includes some of the behaviors that go along with child abuse; isn't that correct, sir?
A. That is correct.
Q. And courses of study include things like grooming, correct, sir?
A. Yes.
Q. Okay. How a perpetrator might, over the course of time, build a relationship, manipulate, use a child so that child does not want to tell even if they've been victimized?
MR. BAJUK: Objection, relevance.
THE COURT: Overruled.
A. That is correct. That is always in our training, yes, it is.
Q. (By Mr. Thielman) And you know through your training that this grooming can consist of a combination of benefits and threats in order to ensure cooperation, correct, sir?
A. It could be, yes. It could, yes.

How [Petitioner] determined how alcohol could play a role in his decision to sexually abuse his step-daughter:

Q. How many beers do you have to have, sir, before having sex with somebody who you've raised since 3 becomes a good idea?
MR. BAJUK: Objection.
THE COURT: Overruled.
A. A lot.

About how [Petitioner] instructed [K.A.] not to talk about the incident:

Q. What did you tell her about telling?
A. It was a one-time incident. I told her she could keep it between me and her and not say anything.
Q. She could keep it between you and her and not say anything? What

21

did you say would happen if she told?

A. I didn't say anything to her.

Q. And she kept it between you and her?

A. She did.

Q. She's a quiet girl?

A. She's not too quiet, but, yeah, she did.

Q. She kept this inside?

A. Yes.

Q. When -- the moment this happened, these things happened, she kept it inside, correct?

A. Yes.

Q. Until her pregnancy became unavoidable, correct, sir?

A. That is correct.

While [Petitioner] may have passionately believed that his willingness to testify would have helped him in front of the jury, it did not. These exchanges demonstrate that Mr. Thielman was able to obtain direct admission from [Petitioner] that he had several opportunities to be alone with [K.A.] in Texas, that he was well aware of the laws related to grooming of a victim, and that he did, in fact, ask her to "not say anything" regarding their sexual encounter. While [Petitioner] did admit on the stand that he "violated" [K.A.], his exchange with Mr. Thielman painted a picture that was clearly hard for the jury to hear:

Q. And you tell her to come outside?

A. Yes.

Q. All right. Do you throw her down?

A. No.

Q. All right. I mean, you compel her to have sex with you?

A. Yes.

Q. All right. So your testimony here is that this particular episode, you forcibly raped your stepdaughter, correct, sir?

A. I don't say forcibly rape.

Q. What did you say? Let me withdraw it. What do you say happened?

A. What happened is I violated my daughter. I was an adult. I was her stepfather. I knew better.

Q. Okay. And I know you want to say those words because you've been practicing those words.

MR. BAJUK: Objection, sidebar.

THE COURT: I'll sustain as to sidebar.

Q. (By Mr. Thielman) You tell me what happened. You tell me what happened. You tell me, what does violate mean, sir?

A. I had sex with her.

Q. How did you have sex with her? On the ground?
A. No.
Q. No?
A. No.
Q. Where?
A. Side of the house standing up.
Q. Side of the house standing up. All right. This is November. Cold?
A. It was not that cold.
Q. All right. Was she wearing long pants?
A. She was wearing her -- I think it was the jacket that she always wears. I can't recall the exact clothing that she had on because it was so far.
Q. Did you pull her clothes down?
A. Yes.
Q. Did you pull yours down?
A. Yes.
Q. And what did she say when you did this?
A. She didn't say anything.
Q. She didn't say anything?
A. No.
Q. She didn't say no? She didn't say stop?
A. (Shakes head back and forth).

In direct examination, [Petitioner] had already corroborated the closeness he had with [K.A.], a fact that had been addressed through the testimony of Ms. Charlene Elliott when she visited the home in September 2011. In fact, Ms. Elliott specifically stated on the witness stand that [Petitioner] "never made any inference as to how his relationship was with his other children" when he was interviewed by Ms. Elliott.

This strong personal connection to [K.A.], coupled with the testimony the jury heard from the stand, clearly did not serve [Petitioner]'s defense. Consider also that the jury was made aware during the trial that [K.A.] had to be arrested in Georgia for refusing to appear in Texas on a material witness warrant. [Petitioner] admitted, under oath, that he was present at the home in Georgia where [K.A.] was hiding, resulting in a separate criminal charge against him for Obstruction.

By taking the stand, [Petitioner] arguably did more to damage his own defense than any of the prior statements from the other witnesses in the trial, including [K.A.]. As I had tried to indicate to my client throughout my representation, his own actions would permit inferences as to his credibility in this case, advise that was borne out when Mr. Thielman would later utilize the above-testimony to argue to the jury that [Petitioner] had the training and the motive to both manipulate his step-daughter while trying to find a plausible explanation that

might avoid prosecution, namely, asserting that the encounter had occurred in a state with a different age of consent.

Even assuming, arguendo, that I had made every objection [Petitioner] propounds I should have made, it does not mean that the result of this case would have been any different considering that [Petitioner] took the stand. In *Jessop v. State,* the appellant was accused and convicted of sexually assaulting a child. Under the facts of the case, it had been shown that the child had "married" the defendant in a "spiritual or celestial" ceremony when the child was 15 years of age. Nearly a year later, the child gave birth to a daughter that DNA testing confirmed was the appellant's child. Appellant attacked his conviction on appeal by noting that there was insufficient evidence to prove territorial jurisdiction, arguing there was no direct evidence that "the sexual act resulting in conception of the child took placed in Texas."

The Austin Court of Appeals noted that jurisdiction could be established by circumstantial proof; even more, it indicated that the burden of proof – whether by a preponderance of the evidence or beyond a reasonable doubt – was unclear. In reviewing the facts in that case, the Court noted that it would give "proper respect for the jury's power to resolve conflicts, evaluate credibility, and weigh the evidence." In that case, the Court viewed the circumstantial evidence to show that the appellant lived with the child "in a sexually intimate relationship" prior to, during and even after the birth of the child.

Similar to this case, [Petitioner] insists through six separate claims that, but for my failure to object or request limiting instructions at the points he identifies in the record, there would have been insufficient evidence to have concluded that [Petitioner] had engaged in sexual conduct with [K.A.] to have supported his convictions for Sexual Assault of a Child and Prohibited Sexual Conduct. Respectfully, I disagree.

As the Austin Court of Appeals noted, the jury would have to resolve conflicts and evaluate credibility; this includes rejecting outright the assertions made by either [Petitioner] or [K.A.] that they never engaged in any other sexual acts in Texas. The fact that [Petitioner] was particularly close to his step-daughter to the point that he felt comfortable to approach her sexually, even in an intoxicated state, could credibly raise doubt that [Petitioner] would not have pursued this relationship more than once. Further, the efforts of [K.A.] to avoid being required to testify, coupled with [Petitioner]'s own willingness to violate his own bond conditions and be in contact with her, does not support the conclusion that this was an innocent mistake. As I noted earlier, [Petitioner] had originally been given the opportunity in the Fall of 2013 to take a plea offer for probation; even when he rejected this offer, Mr. Thielman had initially waived the higher counts of the indictment. [Petitioner]'s

conduct alone made the situation worse for him, forcing him to go to trial on multiple counts, including a 1st degree charge for Continuous Sexual Abuse. While I was able to obtain an acquittal on [Petitioner]'s behalf for that specific count, there is more reason to suspect that [Petitioner]'s own testimony had a significant, negative, impact on the jury's evaluation of him and, by extension, his case.

I therefore respectfully dispute that I rendered ineffective assistance of counsel on [Petitioner]'s behalf. Even considering the errors I concede I made here – I do not believe my overall representation of [Petitioner] fell below the standard of professional norms, nor do I believe that my actions prejudiced [Petitioner]'s case to such an extent that the result of the proceeding would have been different.

SHR01 101-17, ECF No. 16-20 (citations omitted).

Based on counsel's affidavit and the documentary record, the state habeas court entered the following relevant factual findings:

6.      The State had DNA evidence that proved [Petitioner] fathered Victim's baby.

7.      Asserting that [Petitioner] had no sexual contact with Victim was unreasonable.

8.      Asserting that any sexual contact between [Petitioner] and Victim happened outside the jurisdiction of the trial court was a reasonable defense.

9.      When the State asked CPS investigator Elliot what Victim told her regarding the allegations of sexual abuse, Bajuk repeatedly urged hearsay and *Crawford* objections.

10.      The State did not respond to Bajuk's hearsay and *Crawford* objections.

11.      The trial court overruled Bajuk's hearsay and *Crawford* objections outright.

12.      The trial court admitted the objected-to testimony for all purposes.

13.      Elliot testified that Victim told her in a recorded interview that [Petitioner] sexually assaulted her in Fort Worth.

14.      The trial court admitted a text message from Victim to [Petitioner] indicating Victim's desire for a relationship with [Petitioner], over Bajuk's hearsay objection.

15. Bajuk did not request any limiting instructions because he did not believe the jury would have been able to follow a limiting instruction after Elliot was allowed to testify about Victim's statement on direct examination.

16. [Petitioner] presents no evidence or authority that any request for any limiting instruction would have been granted.

17. Bajuk cross examined Elliot regarding the recorded interview.

18. During re-direct, the State offered a video recording of the CPS interview, to which Bajuk renewed his *Crawford* objection.

19. When the State offered the video, Victim had not yet testified.

20. When the State offered the video, Bajuk did not know if Victim would testify.

21. The trial court overruled Bajuk's objection to the admission of the recorded CPS interview.

22. Victim testified that her statement to Elliot that [Petitioner] sexually assaulted her several times in Fort Worth was false.

23. Victim testified that she wrote a letter to the State's criminal investigator, in which she alleged [Petitioner] sexually assaulted her in Fort Worth.

24. Victim testified during direct examination that her statement in the letter to the State's criminal investigator that [Petitioner] sexually assaulted her in Fort Worth was false.

25. Victim admitted that she told the adoption center that she did not know the identity of the father of her baby.

26. Adoption caseworker, Lisa Bergeron ("Bergeron") testified that Victim reported her baby was conceived in Fort Worth, but she did not know the identity of the father.

27. Bajuk did not request limiting instructions for any of Victim's prior accusations that [Petitioner] sexually assaulted her in Fort Worth.

28. Victim wrote an affidavit denying her prior statements that sexual contact occurred in Texas.

SHR02 40-42, ECF No. 16-23 (record citations omitted).

Based on its factual findings, which were later adopted by the Texas Court of Criminal Appeals, and applying the *Strickland* standard and applicable state law, the state court entered the following legal conclusions:

5. "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly[.]"

6. The failure of trial counsel to request a limiting instruction is not, by itself, ineffective assistance.

7. "The decision of whether to request a limiting instruction concerning the proper use of certain evidence . . . maybe a matter of trial strategy."

8. Assistance of counsel is not rendered ineffective for failing to make a frivolous request which the court would properly have refused.

9. A limiting instruction is not warranted when the witness concedes that a prior inconsistent statement was false.

10. Because Victim conceded that her prior statement to Elliot was false, a limiting instruction was not warranted.

11. Because Victim conceded that her prior statement to the State's criminal investigator was false, a limiting instruction was not warranted.

12. [Petitioner] has not shown a reasonable probability the results of the proceedings would have been different had counsel requested limiting instructions on Elliot's testimony regarding Victim's prior statement.

13. [Petitioner] has not shown a reasonable probability the results of the proceedings would have been different had counsel made a request for limiting instructions on the State's criminal investigator's testimony regarding Victim's prior statement.

14. [Petitioner] has not shown a reasonable probability the results of the proceedings would have been different had counsel requested a limiting instruction on the adoption agent's testimony regarding Victim's prior

statement.

15. Bajuk was not ineffective for failing to request a frivolous limiting instruction for the admission of Victim's prior statement to Elliot.

16. Bajuk was not ineffective for failing to request a frivolous limiting instruction for the admission of Victim's prior statement to the State's criminal investigator.

17. Bajuk's decision to forego requesting limiting instructions on Victim's prior statements accusing [Petitioner] of sexually assaulting her in Fort Worth because he believed the jury would likely have been unable to abide by them was reasonable trial strategy.

18. [Petitioner] has not shown that Bajuk was ineffective for failing to request limiting instructions on Victim's prior statements accusing [Petitioner] of sexually assaulting her in Fort Worth.

. . .

23. Bajuk's cross examination of Elliot regarding the contents of the recorded interview – the details to which she had already testified about on direct examination over his hearsay and *Crawford* objections – was the result of reasonable trial strategy.

24. [Petitioner] has not shown a reasonable probability the results of the proceedings would have been different had counsel conducted his cross examination differently.

25. [Petitioner] has not shown that Bajuk was ineffective for cross examining Elliot regarding the contents of the interview to which she earlier testified.

. . .

27. To show ineffective assistance of counsel for the failure to object during trial, the applicant must show that the trial judge would have committed error in overruling the objection.

28. A *Crawford* objection is an objection to testimonial hearsay.

29. Testimonial hearsay statements of witnesses absent from trial are admissible over a *Crawford* objection only when the declarant has been shown to be unavailable and where the defendant has had a prior opportunity to

cross-examine the declarant.

30. Bajuk's *"Crawford"* objection to the recorded CPS interview was the result of reasonable trial strategy.

31. [Petitioner] has not shown that the trial court would have erred by overruling a general hearsay objection to the recorded CPS interview.

32. [Petitioner] has not shown a reasonable probability the results of the proceedings would have been different had counsel made a general hearsay objection rather than his more-specific *"Crawford"* objection to the recorded CPS interview.

33. [Petitioner] has not shown that Bajuk was ineffective for making a *"Crawford"* objection rather than a general hearsay objection when the State offered the recorded CPS interview into evidence.

*Id.* at 42-46 (citations omitted).

Petitioner fails to present any evidence, much less clear and convincing evidence, to rebut the state courts' factual findings, which are supported by the record; thus, this Court must defer to those findings. Having done so, the state court's application of *Strickland* was not objectively unreasonable. Petitioner's claims are largely conclusory, with no legal and/or evidentiary basis, involve state evidentiary rulings or other matters of state law, or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (providing strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or frivolous objections); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) ( providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Ross*

*v. Estelle,* 694 F.2d 1008, 1011-12 (5th Cir. 1983) (providing "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value").

Petitioner has not demonstrated deficient performance or shown any reasonable probability that the outcome of his trial would have been different but for counsel's representation. A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). A petitioner is required to demonstrate that counsel's performance, in light of the entire proceeding, was so inadequate as to render his trial unfair. *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir. 1981). Having reviewed the entirety of the record, counsel's performance was well within the wide range of professionally competent assistance. Further, even if Petitioner could show deficient performance, he fails to establish that he would have been acquitted but for counsel's acts or omissions.

### C. Sufficiency of the Evidence

Under his seventh ground, Petitioner claims that the evidence was insufficient to prove that he sexually assaulted K.A. in the state of Texas. Pet. 7(c), ECF No. 1. Applying applicable state law, the appellate court addressed Petitioner's claim as follows:

[Petitioner] contends the evidence is insufficient to prove he sexually assaulted K.A. in the State of Texas because the only evidence showing the offense occurred in Texas was impeachment evidence, which [Petitioner] maintains had no probative value. [Petitioner] argues venue was an element of the offenses and had to be proved beyond a reasonable doubt.

. . .

Venue is not an element of [Petitioner]'s two offenses. Venue need be proven by only a preponderance of the evidence. Evidence is sufficient to prove venue if a jury may reasonably conclude that the offense was committed in the county alleged.

The party opposing evidence has the burden of objecting and requesting a limiting instruction when the other party introduces the evidence. If evidence is received without a proper limiting instruction, it becomes part of the general evidence in the case and may be used as proof to the full extent of its rational persuasive power.

K.A.'s earlier statements identifying Fort Worth as the location of the offenses came into evidence on numerous occasions. For example, the investigator from Child Protective Services, over a hearsay objection, said K.A. told her the abuse happened in their home in Fort Worth. K.A. herself later twice admitted that she had told the CPS investigator the offenses happened in their house in Fort Worth. Over a leading objection, K.A. admitted writing the criminal investigator a letter in which she identified Fort Worth as the location of the offenses. The letter itself was admitted without any objection. K.A. even admitted telling the criminal investigator it all occurred in Fort Worth. Finally, the caseworker from the adoption center that K.A. had used said—again without any objection—that K.A. reported to the center's admissions department that the sexual encounter happened in Fort Worth. On none of these instances did [Petitioner] request contemporaneous limiting instructions when the evidence was admitted. We hold the evidence was admitted for all purposes. With this evidence, we hold that a jury could have reasonably concluded that the offense was committed in Tarrant County as alleged.

Mem. Op. 2-5, ECF No. 16-3 (citations omitted).

Deferring to the state court's application of state law, as this Court must, Petitioner has not

shown that the state court's determination of the issue is in conflict with clearly established federal

law or was based on an unreasonable determination of the facts in light of the evidence. *See*

*Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *United*

*States v. Bowers,* 660 F.2d 527, 531 (5th Cir. 1981) (noting "venue, *i.e.,* the location of the criminal activity, need only be established by a preponderance of the evidence."). In this case, the evidence was sufficient for the jury to infer that the charged crime was committed where the venue was laid, and that is all that was required.

## VI. CONCLUSION

For the reasons discussed, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. Further, for the reasons discussed, a certificate of appealability is DENIED.

**SO ORDERED** on this 28th day of February, 2019.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**